785 A.2d 726

James LOVELACE, Individually, etc.,

v.

Kenneth ANDERSON, et al.

No. 70, Sept. Term, 1999.

Court of Appeals of Maryland.

Dec. 3, 2001.

Stanley H. Katz (John N. Spector, P.A., on brief,) Baltimore, for petitioner.

Sara E. Angeletti, Assistant City Solicitor, and argued by Mark T. Mixter (John M. Oliveri, Law Offices of Mark T. Mixter, on brief,) Frank C. Derr, Deputy City Solicitor (William R. Phelan, Jr., Principal Counsel, on brief,) Gary Charles May, Chief Solicitor, on brief, Baltimore, David B. Stratton

(Jordan, Coyne & Savits, L.L.P., on brief,) Washington, D.C., for respondents.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY,* RAKER, WILNER, CATHELL, and KARWACKI, ROBERT L. (retired, specially assigned), JJ.

ELDRIDGE, J.

In this tort case, an off-duty Baltimore City police officer, Kenneth Anderson, was employed by a hotel as a private security guard. While Anderson was on duty as a security guard at the hotel, two men entered the hotel lobby and pointed a sawed-off shotgun at the desk clerk, attempting a robbery. Anderson, who was in the hotel lobby at the time, took out his police service handgun, and a gun battle ensued between Anderson and the robbers. The plaintiff James Lovelace, a guest of the hotel who happened to be in the lobby at the time, was struck and injured by a bullet fired from Anderson's handgun.

In Lovelace's tort action against Anderson and the hotel owners and operators, the trial court granted summary judgment in favor of Anderson and the hotel owners and operators, and the Court of Special Appeals affirmed. We granted Lovelace's petition for a writ of certiorari to consider the tort liability, if any, of Anderson and the hotel owners and operators for Anderson's allegedly negligent shooting of Lovelace. We shall reverse the grant of summary judgment.

## I.

### A.

■ The trial court's grant of summary judgment was based on numerous depositions, affidavits, and exhibits. The testimony on several matters was conflicting, and we shall in

---

* Rodowsky, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

our review of the facts note some of those conflicts. Nevertheless, as the tort action against the defendants Anderson and the hotel owners and operators was decided by a grant of the defendants' motions for summary judgment, we must review the facts, and all inferences therefrom, in the light most favorable to the plaintiffs. *See, e.g., Taylor v. Nations-Bank*, 365 Md. 166, 173–174, 776 A.2d 645, 650 (2001) (in reviewing "the propriety of the court's grant of summary judgment * * *, the evidence, and all inferences therefrom, are viewed in the light most favorable to the nonmoving party"); *Jones v. Mid–Atlantic Funding*, 362 Md. 661, 679, 766 A.2d 617, 626 (2001) ("when considering the granting of summary judgment we examine the facts and the inferences derived from the evidence in the light most favorable to the nonmoving party"); *Walpert v. Katz*, 361 Md. 645, 650 n. 2, 762 A.2d 582, 584 n. 2 (2000); *Okwa v. Harper*, 360 Md. 161, 178, 187, 757 A.2d 118, 127, 132 (2000); *Williams v. Baltimore*, 359 Md. 101, 113–115, 753 A.2d 41, 47–48 (2000); *Ashton v. Brown*, 339 Md. 70, 79–80, 660 A.2d 447, 451–452 (1995), and cases there cited.

■ Furthermore, it is an established rule of Maryland procedure that, "[i]n appeals from grants of summary judgment, Maryland appellate courts, as a general rule, will consider only the grounds upon which the [trial] court relied in granting summary judgment." *PaineWebber v. East*, 363 Md. 408, 422, 768 A.2d 1029, 1036 (2001). Judge Rodowsky for the Court in the *PaineWebber* opinion, 363 Md. at 422–423, 768 A.2d at 1036–1037, went on to set forth the reasons for this principle, quoting from *Gresser v. Anne Arundel County*, 349 Md. 542, 709 A.2d 740 (1998), and *Geisz v. Greater Baltimore Med. Ctr.*, 313 Md. 301, 545 A.2d 658 (1988), as follows:

> " '[W]e will not speculate that summary judgment might have been granted on other grounds not reached by the trial court.' "*Gresser*, 349 Md. at 552, 709 A.2d at 745. In *Geisz v. Greater Baltimore Med. Ctr.*, 313 Md. 301, 314, n. 5, 545 A.2d 658, 664 n. 5 (1988), we stated the rule as follows:

" 'On an appeal from the grant of a summary judgment which is reversible because of error in the grounds relied upon by the trial court the appellate court will not ordinarily undertake to sustain the judgment by ruling on another ground, not ruled upon the trial court, if the alternative ground is one as to which the trial court had a discretion to deny summary judgment. For example, a motion might be denied in order to allow the party opposing the motion a further opportunity through discovery to present a triable issue of fact. *See Metropolitan Mtg. Fund v. Basiliko,* 288 Md. 25, 415 A.2d 582 (1980). Thus, in *Henley v. Prince George's County,* 305 Md. 320, 503 A.2d 1333 (1986), a case of alleged negligent hiring, we reversed a summary judgment for a defendant because, contrary to the trial court's conclusion, we found a triable issue of hiring. We would not, however, consider if a lack of proximate cause was an alternative support for the judgment because '[t]he effect of our ruling on the issue of proximate cause, or any other issue not considered by the trial judge would be to deprive the trial judge of discretion to deny or to defer until trial on the merits the entry of judgment on such issues.' *Id.* at 333, 503 A.2d at 1340.' "

*See also, e.g., Bishop v. State Farm,* 360 Md. 225, 234, 757 A.2d 783, 787 (2000) ("it is a settled principle of Maryland appellate procedure that ordinarily an appellate court will review a grant of summary judgment only upon the grounds relied upon by the trial court"); *Ashton v. Brown, supra,* 339 Md. at 80, 119, 660 A.2d at 452, 471; *Gross v. Sussex,* 332 Md. 247, 254 n. 3, 630 A.2d 1156, 1159 n. 3 (1993); *T.H.E. Ins. v. P.T.P., Inc.,* 331 Md. 406, 409 n. 2, 628 A.2d 223, 224 n. 2 (1993); *Boyer v. State,* 323 Md. 558, 588, 594 A.2d 121, 136 (1991).

## B.

In December 1993, Kenneth Anderson was employed by the Baltimore City Police Department, working 40 hours per week as an "administrative sergeant" in the southwest district of Baltimore City. Anderson's duties for the Baltimore City

Police Department at that time consisted of "administrative stuff that . . . came across my desk, with reference to photographs, vehicles, vehicle maintenance, . . . medical." He was not, at the time, "on the streets" for the Police Department.

Also in December 1993, during his off-duty hours as a Baltimore City policeman, Anderson was employed as a security guard at a hotel outside of Baltimore City. The hotel was then called the Days Inn, and it was located on Security Boulevard in Baltimore County. According to Anderson's deposition testimony, he worked 24 or 25 hours per week for the Days Inn. Anderson further testified that, at the time he and other security guards were hired by the Days Inn, the person who hired them "wanted us to work security. She had special, you know, assignments for us that she wanted, and one of them was to prevent robberies if we could. . . ." When on duty as a security guard for the Days Inn, Anderson would not wear his police uniform but would dress in "just regular everyday plain clothes." Anderson further testified that, when he and others were on duty as security guards, the management of the Days Inn "did not want our guns to show." Anderson's police service handgun was a Glock 17 nine millimeter semi-automatic pistol which, when fully loaded, would hold seventeen bullets. He carried this handgun, concealed, when acting as a security guard for the hotel. Anderson had not obtained from the Maryland State Police a permit to carry a handgun when employed as a security guard at the Days Inn in Baltimore County.

During the late afternoon and evening of December 2, 1993, Anderson was not on duty in Baltimore City as a policeman. Instead, he was on duty as a security guard at the Days Inn, working the 4:00 p.m. to midnight shift. He was paid by the owners and operators of the Days Inn for the 4:00 p.m. to midnight period on December 2, 1993.

On the evening of December 2, 1993, James Lovelace was a guest at the Days Inn on Security Boulevard, and he had been a guest at the hotel for the previous five or six days. Prior to the evening of December 2, 1993, Lovelace had been intro-

duced to Anderson, and he knew that Anderson was one of the security guards at the Days Inn. Michael Gordon was employed as a desk clerk at the Days Inn, and he was on duty behind the desk during the evening of December 2, 1993.

At about 8:10 p.m. on December 2, 1993, Lovelace walked into the lobby at the Days Inn and stood at one end of the front desk which was about ten feet in length. Gordon was behind the front desk, and Anderson was sitting on a sofa in the lobby. A few seconds after Lovelace entered the hotel lobby, two men, later identified as Earl Jennings and Randy Terry, and both "dressed in a scrubby fashion," entered the hotel lobby and walked to the front desk. The testimony as to where Jennings and Terry were standing at the front desk was conflicting. Terry removed a sawed-off shotgun from under his coat, pointed it at the desk clerk Gordon, and yelled "hold up." Jennings immediately thereafter took out a bag, handed it to Gordon, and Gordon started toward the cash register.

Anderson testified that when Terry pointed the shotgun at Gordon and yelled "hold up," Anderson stood up, unzipped his jacket, got out his pistol, and announced "police." According to Anderson, Terry turned around and fired at Anderson. Anderson stated that he returned the fire, that he was shooting with "tunnel vision," that the "only thing I could see was that shotgun and the two suspects," and that he lost "sight of Mr. Lovelace." Anderson discharged twelve rounds of ammunition in "about three seconds."

Jennings was killed by a shot to his head. Terry was shot in the back, but he was able to flee. Terry was later apprehended, convicted of attempted robbery and attempted murder, and sentenced to imprisonment for 32 years. Anderson lost three fingers from his left hand as a result of the gun battle. Anderson did not know that Lovelace had been shot until sometime after the gun battle.

Lovelace's testimony contradicted Anderson's in some particulars. According to Lovelace, after Terry pointed a shotgun at Gordon and yelled "hold up," and after Jennings

handed a bag to Gordon, Anderson stood up and fired the first shot. Lovelace testified that Anderson did not say "police" before firing that initial shot. Lovelace also indicated that Anderson's first shot struck Jennings, and that Jennings then fell to the floor. Immediately thereafter, Lovelace dropped to the floor although he had not been hit at that time. Lovelace stated that he was lying on the floor with his feet near Jennings's head, and that he saw Terry get shot and stagger out of the lobby. Lovelace testified that he then saw that Anderson was pointing his gun in the direction of Jennings's head and Lovelace's feet, that the gun went off, and that the bullet hit Lovelace's feet. The bullet went through one foot and into the ankle of Lovelace's other foot. After he was shot, Lovelace was able to move over to the sofa. When Lovelace was at the sofa, he saw Jennings sit up, clutch his mid-section, and heard him "moaning and groaning." Thereupon, Lovelace testified, "Sergeant Anderson stood in back of him [Jennings] and shot him in the back of the head and killed him."

Lovelace was initially taken to St. Agnes hospital in Baltimore, and he was later treated at a Veterans Administration (VA) hospital. At the time of his deposition in 1997, Lovelace was still going to the VA hospital every two weeks for treatment because of the injury to his feet, and he needed a cane in order to walk.

Terry testified that, after he yelled "hold up," Anderson fired the first shot, that the first bullet hit Terry, and that Terry returned the fire. According to Terry, Anderson did not identify himself as a police officer. Terry stated that Jennings did not fire a gun, that Terry had both a 12 gauge shotgun and a .357 magnum handgun, and that he did not begin shooting until Anderson shot him. Terry testified that he fired the shotgun twice and the handgun six times. Terry claimed that he did not see Anderson until Anderson fired his gun. Terry estimated that the gun battle lasted five or six minutes.

A ballistics expert, who had worked fifteen years for the Maryland State Police Crime Laboratory, stated that the

bullet recovered from Lovelace's body was fired from Anderson's Glock 17 nine millimeter pistol.

This case was further complicated by the fact that the ownership of the Days Inn changed on December 2, 1993. Up until sometime on December 2nd, Sage Hospitality Resources, Inc., managed the hotel under a managing agreement with the owner, the Bank of Baltimore, and Sage employed Anderson as a security guard. On December 2, 1993, the hotel was sold to Sterling Hotel, Inc., and Sterling, either then or sometime thereafter, became Anderson's employer. Although the closing occurred in the evening of December 2nd shortly before the attempted robbery, the evidence was conflicting as to the private hotel corporation which was Anderson's employer when the attempted robbery took place. When asked "what if any participation did Sage Resources, Inc., have in the managing of the premises" after "the closing took place," a representative of Sage testified, "none I believe." Certain documentary evidence supported an inference that Sage's management responsibilities ended prior to the attempted robbery. Other documentary evidence and pay records, however, indicated that Sage's management responsibilities extended beyond the closing to the end of the day.[1] The Workers' Compensation Commission determined that Sage Hospitality Resources, Inc., and the Mayor and City Council of Baltimore, were co-employers of Anderson at the time of his injury.[2]

---

**1.** We have in this opinion used the word "hotel" or the phrases "hotel owners and operators" or "Days Inn" to refer to Anderson's private employer or employers, whether Sage or Sterling or both.

**2.** An action for judicial review of the Workers' Compensation Commission's decision was filed in the Circuit Court for Baltimore County. While the action was pending in the Circuit Court, the parties reached an agreement that Baltimore City would pay two-thirds of the compensation award and Sage would pay one-third of the award. The Circuit Court thereupon remanded the case to the Commission for modification of its prior decision. The Commission then modified its prior decision and directed that Baltimore City pay two-thirds of the award and Sage pay one-third of the award. There was no modification of the decision that Baltimore City and Sage were co-employers of Anderson at the time of the incident.

## C.

Certain regulations of the Baltimore City Police Department, as well as state statutory provisions, have been relied upon by various parties in this case. These concern secondary employment of police officers, authority of police officers outside of their territorial jurisdiction, and immunities of police officers.

Maryland Code (1957, 1996 Repl.Vol.), Art. 27, § 729A, provides as follows:

> "A law enforcement agency may not prohibit secondary employment but may promulgate reasonable regulations as to a law enforcement officer's secondary employment." [3]

Rules and Regulations of the Baltimore City Police Department, contained in various "General Orders" of the Department, specifically regulate secondary employment by police officers, including secondary employment outside of Baltimore City. General Order 6–90, paragraphs one and two, provide for the obtaining of the Department's permission to engage in secondary employment and limit allowable secondary employment to that specified in the permission. Paragraph nine of the same General Order requires a police officer engaging in secondary employment to

> "9. Obtain a handgun permit from the Maryland State Police, when you are required by your secondary employers to be armed as a condition of your employment. In this case, you are armed under the authority of your secondary employer."

Paragraph eleven of the same General Order, relating to secondary employment outside of Baltimore City, states that a police officer

> "11. May obtain secondary employment outside the City of Baltimore, as long as all the following conditions are met:

---

**3.** For a review of the background and legislative history of this statute, *see* Chief Judge Bell's opinion for the Court in *Fraternal Order of Police v. Mehrling,* 343 Md. 155, 680 A.2d 1052 (1996).

a. You are acting as a private citizen, without exercising powers and duties of a police officer.

b. You are not using Baltimore City Police credentials or equipment.

c. You are not acting as a special police officer or private detective, except when employed in accident reconstruction or arson investigation.

d. You are not operating as a private detective, guard and/or watchman agency."

Anderson had received permission from the Baltimore City Police Department to work as a security guard at the Days Inn. Nevertheless, as previously mentioned, Anderson had not obtained a permit from the Maryland State Police to carry a handgun while engaged in his secondary employment. In an affidavit filed in support of the plaintiffs' opposition to the motions for summary judgment, Colonel Wilbert T. Travers, Jr., a former Superintendent of the Maryland State Police, expressed the opinion that Anderson's secondary employment was in violation of Baltimore City Police Department regulations concerning secondary employment, that he was not acting as a Baltimore City Police Officer during the gun battle, and that he was guilty of gross negligence.

A state statutory provision in effect in December 1993, and presently codified as Code (2001), § 2–102 of the Criminal Procedure Article, delineates the authority of a police officer to exercise police powers outside of the officer's jurisdiction. Subsections (b)(c) and (d) of § 2–102 provide in pertinent part as follows (emphasis added):

"(b) *In general.*—(1) Subject to the limitations of paragraph (3) of this subsection, a police officer may make arrests, conduct investigations, and otherwise enforce the laws of the State throughout the State without limitations as to jurisdiction."

\* \* \*

"(3) A police officer may exercise the powers granted by this section when:

(i) 1. the police officer is participating in a joint investigation with officials from another state, federal, or local law enforcement unit, at least one of which has local jurisdiction;

2. the police officer is rendering assistance to another police officer;

3. the police officer is acting at the request of a police officer or State Police officer; or

4. *an emergency exists; and*

(ii) *the police officer is acting in accordance with regulations adopted by the police officer's employing unit to carry out this section."*

\* \* \*

"(c) *Required notifications.*—(1) A police officer who acts under the authority granted by this section shall notify the following persons of an investigation or enforcement action:

\* \* \*

"3. the chief of police or chief's designee, when in a county with a county police department, except Baltimore City;

\* \* \*

"(d) *Immunities and exemptions; employee status.*—A police officer who acts under the authority granted by this section:

(1) has all the immunities from liability and exemptions as a State Police officer in addition to any other immunities and exemptions to which the police officer is otherwise entitled; and

(2) remains at all times and for all purposes an employee of the employing unit."

The plaintiffs have consistently argued that Anderson was in violation of subsections (b)(3)(4)(ii) and (c)(1)(i)(3) of the above-quoted statute, that, therefore, he was not acting as a Baltimore City police officer during the evening of December 2,

1993, and that, for this reason, he was not entitled to the immunities of a police officer.[4]

Some statutory provisions referred to by the parties concern the immunities of government officers or, specifically, police officers. Code (1974, 1998 Repl.Vol.), § 5-507(b)(1) of the Courts and Judicial Proceedings Article, provides:

> "An official of a municipal corporation, while acting in a discretionary capacity, without malice, and within the scope of the official's employment or authority shall be immune as an official or individual from any civil liability for the performance of the action."

*See also* § 5-511(b) of the Courts and Judicial Proceedings Article ("an official of a governmental entity, while acting in a discretionary capacity, without malice, and within the scope of the official's authority is immune" from tort liability). We have pointed out that the purpose of these provisions "was to codify existing public official immunity, and not to extend the scope of qualified immunity beyond its Maryland common law boundaries." *Ashton v. Brown, supra,* 339 Md. at 116 n. 23, 660 A.2d at 470 n. 23. We have also held that a police officer, while acting in the scope of his employment as a police officer, is a "public official" for purposes of the public official immunity doctrine. *Williams v. Baltimore, supra,* 359 Md. at 138–139, 753 A.2d at 58–59, and cases there cited.

The doctrine of public official immunity under Maryland law was summarized by the Court in *James v. Prince George's County,* 288 Md. 315, 323–324, 418 A.2d 1173, 1178 (1980) (emphasis in original):

> "Before a governmental representative in this State is relieved of liability for his negligent acts, it must be determined that the following independent factors *simultaneously* exist: (1) the individual actor, whose alleged negligent conduct is at issue, is a *public official* rather than a mere *government employee or agent;* and (2) his tortious conduct

---

4. For a recent review of the statute now codified as § 2–102 of the Criminal Procedure Article, *see* Judge Wilner's opinion for the Court in *Boston v. Baltimore County Police,* 357 Md. 393, 744 A.2d 1062 (2000).

occurred while he was performing *discretionary,* as opposed to *ministerial,* acts in furtherance of his official duties."

\* \* \*

■ "Once it is established that the individual is a public official *and* the tort was committed while performing a duty which involves the exercise of discretion, a qualified immunity attaches; namely, in the absence of malice, the individual involved is free from liability."

As indicated above, the defense of public official immunity generally applies only to negligent acts. In *DiPino v. Davis,* 354 Md. 18, 49, 729 A.2d 354, 370 (1999), after setting forth the above-quoted language from *James v. Prince George's County, supra,* Judge Wilner for the Court stated:

"Those principles apply to negligent conduct, not to intentional conduct. In *Cox v. Prince George's County,* 296 Md. 162, 460 A.2d 1038 (1983), we made clear that a police officer, who might otherwise have the benefit of this immunity, does not enjoy it if the officer commits an intentional tort or acts with malice."

*See also Ashton v. Brown, supra,* 339 Md. at 117, 660 A.2d at 470 ("Public official immunity is not a defense to . . . intentional torts"); *Parker v. State,* 337 Md. 271, 285, 653 A.2d 436, 443 (1995).

There are other limitations to the defense of public official immunity. The defense is not applicable "in an action based on rights protected by the State Constitution." *DiPino v. Davis, supra,* 354 Md. at 51, 729 A.2d at 371. *See also Okwa v. Harper, supra,* 360 Md. at 201–202, 757 A.2d at 140; *Ashton v. Brown, supra,* 339 Md. at 102–106, 660 A.2d at 463–465, and cases there cited.

■ Furthermore, unless the public official's governmental employer itself has immunity from an independent source, the public official's qualified immunity does not extend to the employer, and the employer can be held liable, under the doctrine of respondeat superior, for the official's negligence occurring in the scope of employment even though the official may be entitled to immunity. *DiPino v. Davis, supra,* 354

Md. at 48 n. 6, 729 A.2d at 370 n. 6; *Parker v. State, supra,* 337 Md. at 286, 653 A.2d at 443; *Boyer v. State, supra,* 323 Md. at 582–583, 594 A.2d at 133; *Surratt v. Prince George's County,* 320 Md. 439, 443–445, 578 A.2d 745, 747–748 (1990); *Hatzinicolas v. Protopapas,* 314 Md. 340, 355–356, 550 A.2d 947, 954–955 (1988); *Clea v. City of Baltimore,* 312 Md. 662, 667 n. 2, 541 A.2d 1303, 1305 n. 2 (1988); *Cox v. Prince George's County,* 296 Md. 162, 167–169, 460 A.2d 1038, 1041 (1983); *James v. Prince George's County, supra,* 288 Md. at 331, 418 A.2d at 1182 ("Consequently, if the complained of conduct is performed by a county representative while acting within the scope of his employment but in a negligent manner, Prince George's County will be subject to suit for the resulting damage, without regard to the fact that the agent had public-official immunity").

Another limitation to a police officer's defense of public official immunity occurs when, under the circumstances, a special relationship exists between the officer and the injured person which creates a duty on the part of the officer to protect the victim. Judge Cathell for the Court, in *Williams v. Baltimore, supra,* 359 Md. at 143–145, 753 A.2d at 64–65, recently discussed in detail this principle, as well as our earlier cases, and particularly *Ashburn v. Anne Arundel County,* 306 Md. 617, 510 A.2d 1078 (1986). We explained in *Williams,* 359 Md. at 143–144, 753 A.2d at 64 (footnotes and some citations omitted, emphasis in original):

"Thus, we recognize the general rule, as do most courts, that absent a 'special relationship' between police and victim, liability for failure to protect an individual citizen against injury caused by another citizen does not lie against police officers. Rather, the 'duty' owed by the police by virtue of their positions as officers is a duty to protect the public, and the breach of that duty is most properly actionable by the public in the form of criminal prosecution or administrative disposition."

\* \* \*

"As evidenced in the wording of *Ashburn,* Maryland recognizes that liability for failure to protect an individual

citizen against injury caused by another citizen, where the officer is performing a discretionary act, does not lie against an officer, *absent a 'special relationship.'* In the presence of a 'special relationship' liability may lie and immunity may not survive. Thus, '[t]he public duty doctrine ... is not an absolute bar to recovery.' ... As we continued in *Ashburn:*

> "'A proper plaintiff, however, is not without recourse. If he alleges sufficient facts to show that the defendant policeman created a 'special relationship' with him upon which he relied, he may maintain his action in negligence. *See Restatement (Second) of Torts* § 315(b).'"

Moreover, when a police officer is acting outside of his or her jurisdiction, the General Assembly has appeared to require the presence of two additional circumstances as a condition for immunity. Code (1974, 1998 Repl.Vol.), § 5–605(a) of the Courts and Judicial Proceedings Article, states:

" **§ 5–605. Law enforcement officer acting outside jurisdiction.**

(a) *When not civilly liable.*—A law enforcement officer acting outside the officer's jurisdiction but in the State, is not civilly liable, except to the extent that he would be if acting in his own jurisdiction, for any act or omission in preventing or attempting to prevent a crime, or in effectuating an arrest, in order to protect life or property if:

(1) The action is not grossly negligent; and

(2) The action is taken at the scene of the crime or attempted crime."

Finally, the Local Government Tort Claims Act, Code (1974, 1998 Repl.Vol., 2001 Supp.), § 5–301 *et seq.* of the Courts and Judicial Proceedings Article, provides an immunity, from paying a judgment, to a local government employee who commits a tortious act within the scope of his local government employment, provided that the employee did not act with malice. *See* § 5–302(b). This provision, however, has no application to the present case. Employees of the Baltimore City Police Department were not included within the Local Government Tort Claims Act until the enactment of Ch. 364 of the Acts of 1997,

effective October 1, 1997. Section 2 of Ch. 364 provides that "this Act shall be construed only prospectively and may not be applied or interpreted to have any effect on or application to any cause of action arising before the effective date of this Act."

### D.

This action commenced when James Lovelace and the United States Department of Veterans Affairs filed in the Circuit Court for Baltimore City a complaint for compensatory tort damages, based on the injury Lovelace suffered during the evening of December 2, 1993, at the Days Inn. Named as defendants were Kenneth Anderson, Sage Hospitality Resources, Inc., Sterling Hotel, Inc., the Mayor and City Council of Baltimore, the Baltimore City Police Department, the Baltimore City Police Commissioner, and the State of Maryland. The plaintiffs asserted that Anderson acted both with negligence and with gross negligence. The plaintiffs alleged, in the alternative, that each of the defendants (other than Anderson) was Anderson's employer at the time and that Anderson was acting in the scope of his employment for such defendant.

Upon the motion of the defendant Sterling Hotel, Inc., the Circuit Court for Baltimore City transferred the case to the Circuit Court for Baltimore County.

Thereafter, motions to dismiss were filed on behalf of the Mayor and City Council of Baltimore, the Baltimore City Police Department, the Baltimore City Police Commissioner, and the State of Maryland. The motions to dismiss on behalf of the Mayor and City Council, the Police Department, and the Police Commissioner, asserted that the complaint failed to state a claim against the movants upon which relief could be granted, that the movants were protected by immunity, that the movants were not proper defendants, and that, for purposes of respondeat superior tort liability, the governmental employer of Anderson on December 2, 1993, was not Baltimore City but was the State of Maryland. *See Clea v. City of Baltimore, supra,* 312 Md. at 666–671, 541 A.2d at 1305–1307.

In the motion to dismiss by the State of Maryland, the State asserted, *inter alia,* that it was entitled to governmental immunity and that "[t]he State of Maryland is not vicariously liable for alleged tortious conduct of a police officer who did not act in the scope of his public duties." By separate orders entered at various times, the Circuit Court for Baltimore County granted the motions to dismiss filed by the Mayor and City Council, the Police Department, the Police Commissioner, and the State of Maryland.

After extensive discovery, including numerous depositions, and the filing of affidavits and exhibits, the defendants Anderson, Sage, and Sterling filed motions for summary judgment. Following a hearing, the Circuit Court on June 12, 1998, rendered a final judgment granting the motions for summary judgment. In its judgment order, the court determined that Anderson was at the time of the gun battle working as a security guard for the hotel and not as a police officer. The summary judgment was premised upon the assumption that there was sufficient evidence to show that Anderson acted negligently, but the court held that there was no evidence to show that his action "was intentional, [or] with malice or gross negligence." The court further held that "Anderson, though working as a security guard at the time, possessed the same immunity from suit as if he [were] working as a police officer." Since, in the court's view, there was no evidence of malice or gross negligence, Anderson was held to be immune from a tort suit based on simple negligence. The Circuit Court's final judgment on June 12, 1998, did not expressly purport to resolve the conflict as to whether Sage or Sterling or both were Anderson's employers when the shooting incident took place, and the order simply granted summary judgment in favor of both Sage and Sterling, as well as Anderson. The court seemed to be of the view that Anderson's qualified immunity extended to his hotel employer.[5]

---

5. At an earlier stage in the case, and despite the conflicting evidence, the Circuit Court did appear to make an interlocutory ruling that Sterling, not Sage, was Anderson's employer.

The plaintiffs appealed, and the Court of Special Appeals affirmed. *Lovelace v. Anderson,* 126 Md.App. 667, 730 A.2d 774 (1999). While agreeing with the Circuit Court that there was no evidence of malice or gross negligence on the part of Anderson, the Court of Special Appeals' reasoning differed substantially from that of the trial court. Whereas the Circuit Court had held that, during the gun battle, Anderson was acting as a private security guard for the hotel and not as a police officer, the Court of Special Appeals held that when the hold up began, "Anderson reverted to his police officer status," that he "was not the agent of either Sage or Sterling," and that he was acting exclusively "within the scope of his employment as a law officer at the time of the shooting," *Lovelace v. Anderson, supra,* 126 Md.App. at 689, 705, 707–708, 730 A.2d at 786, 795, 796. Since, in the Court of Special Appeals' view, Anderson was acting solely as a police officer, the appellate court concluded that neither Sage nor Sterling were liable under the principle of respondeat superior, and that Anderson was entitled to public official immunity.

Relying on the holding of *Bradshaw v. Prince George's County,* 284 Md. 294, 305, 396 A.2d 255, 262 (1979), that a governmental employer "cannot be held liable under the doctrine of *respondeat superior*" when the governmental employee individually is not liable because of public official immunity, the Court of Special Appeals held that "there can be no

---

In addition, at an earlier stage in the proceedings Lovelace had argued that Sage was collaterally estopped from asserting that it was not Anderson's employer when the attempted robbery took place. Lovelace relied on the adjudication in the workers' compensation case that Sage was Anderson's co-employer at the time of the gun battle. The Circuit Court, during a hearing, rejected the collateral estoppel argument, apparently being of the view that "Maryland has never had a rule of ... issue preclusion" based on adjudications in workers' compensation proceedings. The Circuit Court's June 12, 1998, final judgment order did not deal with the issue, since the court was of the view that Anderson's hotel employer would be entitled to immunity regardless of whether that employer was Sage or Sterling or both. Presumably because it was not an issue underlying the grant of summary judgment, the collateral estoppel issue has not been raised on this appeal. The issue could, of course, be raised in the Circuit Court after remand.

liability on the part of [Anderson's] employers, the State of Maryland," the Mayor and City Council of Baltimore, the Baltimore City Police Department, and the Police Commissioner. *Lovelace v. Anderson, supra,* 126 Md.App. at 707, 730 A.2d at 796. The Court of Special Appeals overlooked the fact that the above-mentioned holding in *Bradshaw v. Prince George's County, supra,* had been expressly overruled in *James v. Prince George's County, supra,* 288 Md. at 331, 418 A.2d at 1182. *See DiPino v. Davis, supra,* 354 Md. at 48 n. 6, 729 A.2d at 370 n. 6.

The plaintiffs filed a petition for a writ of certiorari presenting several questions, and this Court granted the petition. *Lovelace v. Anderson,* 355 Md. 610, 735 A.2d 1105 (1999). None of the defendants filed a cross-petition for a writ of certiorari. Our order granting the certiorari petition neither limited nor expanded the issues for review by this Court.

## II.

The plaintiffs baldly assert in their brief that the Circuit Court erred in granting the motions to dismiss filed on behalf of the Mayor and City Council of Baltimore, the Baltimore City Police Department, the Police Commissioner, and the State of Maryland, and that "the judgments in favor of all of the defendants should be reversed." (Petitioners' brief at 41, 49). Nevertheless, the questions presented in the certiorari petition, and repeated in the plaintiffs' brief, relate solely to the liability of Anderson, Sage, and Sterling. Furthermore, the arguments in the certiorari petition and in the plaintiffs' brief are directed exclusively at the tort liability of Anderson, Sage, and Sterling.

The plaintiffs contend that it was error to grant the motions for summary judgment filed by Anderson, Sage, and Sterling, because there were numerous material facts in dispute relating to the liability of these three defendants. In addition, the plaintiffs maintain that the evidence was sufficient to show that Anderson was guilty of ordinary negligence and, alternatively, gross negligence. The plaintiffs further argue that, for

several reasons, neither Anderson nor the hotel owners and operators were entitled to any form of immunity. The plaintiffs claim that Anderson was not acting as a police officer during the evening of December 2, 1993, that Anderson was acting in the scope of his employment as a security guard for the hotel, and that he was, during the attempted robbery and gun battle, doing precisely what he was hired to do and paid to do for the hotel. A principal thrust of the plaintiffs' argument is that Anderson was acting exclusively for the hotel owners and operators during the evening of December 2, 1993. Alternatively, the plaintiffs assert that Anderson was acting within the scope of his employment for both the hotel and the Police Department during the incident on December 2nd, and that, therefore, a jury could properly find that Sage, or Sterling, or both, were liable under the doctrine of respondeat superior. The plaintiffs do not in any manner deal with the holdings of the courts below or the defendants' arguments as to why Baltimore City, the Police Department, the Police Commissioner, or the State, are not liable in tort for Anderson's actions during the evening of December 2, 1993.

■ Maryland Rule 8–131(b) provides that, in reviewing the decision of an intermediate appellate court, unless otherwise provided by order of this Court, "the Court of Appeals ordinarily will consider only an issue that has been raised in the petition for certiorari or any cross-petition...." For a detailed discussion of this provision, see Judge Cathell's opinion for the Court in Wynn v. State, 351 Md. 307, 319–325, 718 A.2d 588, 594–597 (1998). As the plaintiffs' petition for a writ of certiorari presented no issues relating to the possible tort liability of Baltimore City, the Police Department, the Police Commissioner, and the State, we shall not in this opinion decide whether the motions to dismiss filed by these defendants should have been granted.

In addition, even if a question concerning the liability of these four governmental defendants had been included in the certiorari petition, the absence of any argument in the petitioners' brief dealing with the possible liability of these defen-

dants would ordinarily preclude our consideration of such issue. In another case involving an attempt to impose tort liability upon the Baltimore City Police Department and the Police Commissioner, based upon the tortious conduct of a police officer, we stated (*Clea v. City of Baltimore, supra,* 312 Md. at 671, 541 A.2d at 1307, emphasis deleted):

> "The issue of the Police Department's and the Commissioner's liability or non-liability, as state agencies, for Officer Leonard's conduct has never been raised in this case. The pertinent principles, considerations, and authorities have been entirely overlooked. Absent any briefing or argument whatsoever concerning the issue, we decline to decide it."

Consequently, for the reasons set forth above, we shall affirm the judgment in favor of Baltimore City, the Baltimore City Police Department, the Baltimore City Police Commissioner, and the State of Maryland, without directly ruling upon any of the issues raised or discussed in the courts below relating to the liability or non-liability of those four defendants.

## III.

We shall next address the Circuit Court's holding that, although Anderson was working as a security guard for the hotel and not as a police officer during the attempted robbery, Anderson nevertheless was entitled to a police officer's public official immunity and that such immunity extended to his private employer or employers.

Preliminarily, as we have previously discussed, even if the defense of public official immunity were available to Anderson, it would not extend to his employer or employers. *DiPino v. Davis, supra,* 354 Md. at 48 n. 6, 729 A.2d at 370 n. 6; *James v. Prince George's County, supra,* 288 Md. at 332, 418 A.2d at 1182 ("the master remains liable for the servant's conduct even though the servant is himself not liable because of a personal immunity").

■ Moreover, while acting as a private security guard for the hotel, Anderson was clearly not entitled to public official immunity. One is entitled to public official immunity only when he is acting as "a *public official* rather than" in some other capacity and only when "his tortious conduct occurred while he was performing discretionary, as opposed to ministerial, acts *in furtherance of his official duties,*" *James v. Prince George's County, supra,* 288 Md. at 323, 418 A.2d at 1178 (emphasis added and deleted). *See, e.g., DiPino v. Davis, supra,* 354 Md. at 48–49, 729 A.2d at 370; *Clea v. City of Baltimore, supra,* 312 Md. at 672–673, 541 A.2d at 1308; *Ashburn v. Anne Arundel County, supra,* 306 Md. at 622–624, 510 A.2d at 1080–1081.

■ Privately employed security guards, however, are not entitled to immunity when their negligence in attempting to prevent crimes or apprehend criminals is a proximate cause of injury to innocent third persons. *Giant Food v. Scherry,* 51 Md.App. 586, 591, 444 A.2d 483, 487 (1982), and cases there cited. *See also Giant Food v. Mitchell,* 334 Md. 633, 645, 640 A.2d 1134, 1139–1140 (1994), discussing with approval the *Scherry* opinion.

The *Scherry* case involved an armed robbery of a cashier at a store in a shopping center. An armed security guard employed by the store, and on duty at the store, fired two shots at the fleeing robber. One of the shots went through a window at the plaintiff's residence across the street from the shopping center, and caused injury to the plaintiff. The Court of Special Appeals affirmed a judgment in favor of the plaintiff and against the store. After pointing out that Maryland law gave the security guard the right and authority to arrest the robber, Judge Wilner for the Court of Special Appeals continued (51 Md.App. at 591, 444 A.2d at 487):

"These kinds of situations, in which an innocent bystander is injured or killed in the course of an attempt to apprehend a criminal or defend an attack on one's person or property, arise in a variety of contexts—some more life-threatening to the actor than others, some involving felons and felonies,

others involving misdemeanants and misdemeanors. The context is important in determining the reasonableness of the action taken, but the basic standard seems to be the same. Where the evidence shows that the actor ... acted without due regard to the danger caused to innocent third parties, he (and his employer) have been held liable."

 A person, including an off-duty public official, who negligently injures someone while acting in the scope of his or her employment for a private employer, is not entitled to public official immunity.[6]

## IV.

The theory of the Court of Special Appeals' affirmance of the summary judgment was that, when the attempted robbery began during the evening of December 2, 1993, Anderson's status automatically changed from a privately-employed security guard to a Baltimore City police officer, that he was acting exclusively as a Baltimore City police officer, and that he "was not the agent of either Sage or Sterling," 126 Md.App. at 705, 730 A.2d at 795.

 In light of the evidence presented in the Circuit Court, as well as the pertinent regulations and statutory provisions, Lovelace makes a forceful argument in support of the Circuit Court's holding that Anderson was acting entirely as a private security guard for the hotel and not as a Baltimore City police officer. At the very least, a factual matter for the jury on this issue may have been presented. *See Great*

---

6. Even if an off-duty police officer, while working in the scope of employment as a security guard for a private business, were somehow entitled to public official immunity, such immunity would not apply under the facts of this case. As earlier mentioned, a police officer is not entitled to the qualified immunity if there is a special relationship between the victim and the police officer. *Williams v. Baltimore*, 359 Md. 101, 143–144, 753 A.2d 41, 64–65 (2000); *Ashburn v. Anne Arundel County*, 306 Md. 617, 510 A.2d 1078 (1986). There does exist a special relationship between an innkeeper's employees and the innkeeper's guests. As discussed in Part IV of this opinion, *infra*, an innkeeper and the innkeeper's employees owe a duty to the inn's guests to protect the guests and their property.

*Atlantic Tea v. Imbraguglio,* 346 Md. 573, 590, 697 A.2d 885, 893 (1997) ("Ordinarily, the existence of the employer/employee relationship is a question reserved for the fact finder"). Nonetheless, solely for purposes of these appellate proceedings, we shall assume *arguendo* that Anderson was acting in the scope of his employment as a Baltimore City police officer during the incident on the evening of December 2, 1993. We shall further assume *arguendo* that he was not acting maliciously or with gross negligence.

What the Court of Special Appeals' holding overlooked, however, is the settled principle of Maryland law that "[a] worker may simultaneously be the employee of two employers." *Whitehead v. Safway Steel Products,* 304 Md. 67, 79, 497 A.2d 803, 809 (1985). *See also, e.g., Great Atlantic Tea v. Imbraguglio, supra,* 346 Md. at 591, 697 A.2d at 894 ("That an employee can concurrently serve two employers is not a novel concept in Maryland law"); *Auto. Trade Ass'n v. Harold Folk Enterprises,* 301 Md. 642, 659, 484 A.2d 612, 621 (1984) ("As an initial matter, we recognize 'that, under certain circumstances, a person performing a given function simultaneously may be the employee of two employers' "); *Comptroller v. Atlantic Supply Co.,* 294 Md. 213, 222, 448 A.2d 955, 960 (1982); *Keitz v. National Paving Co.,* 214 Md. 479, 491, 134 A.2d 296, 301 (1957).

Thus, in a case somewhat like the present one in that a workers' compensation proceeding had determined that one entity was the employer when an incident occurred, and the issue in a later tort case was whether a different entity was the employer for purposes of respondeat superior liability, this Court explained (*Mackall v. Zayre Corp.,* 293 Md. 221, 228–229, 443 A.2d 98, 102 (1982)):

> "The relevant issue actually litigated in the workmen's compensation proceeding was Alden's status as an employer and the fact determined there was that Alden was Mackall's employer. Zayre's status as Mackall's employer was not in issue and, therefore, was not determined in the workmen's compensation proceeding. The issue presented in the sub-

sequent tort action was Zayre's status as Mackall's employer, and the fact to be determined there was whether Zayre, as well as Alden, was her employer. Accordingly, under the applicable principle of collateral estoppel, Zayre was not prevented, in the subsequent tort action, from litigating its status as Mackall's employer."

\* \* \*

"This Court has repeatedly recognized that, under certain circumstances, a person performing a given function simultaneously may be the employee of two employers. *Keitz v. National Paving & Contracting Co.,* 214 Md. 479, 491, 134 A.2d 296, 301 (1957); *Bauer v. Calic,* 166 Md. 387, 398–401, 171 A. 713, 717–19 (1934); *see Greer Lines Co. v. Roberts,* 216 Md. 69, 80–81, 139 A.2d 235, 240–41 (1958). Courts in other jurisdictions have reached the same conclusion. *E.g. Nash v. Sears, Roebuck & Co.,* 383 Mich. 136, 143, 174 N.W.2d 818, 820 (1970); *Antonini v. Hanna Indus.,* 94 Nev. 12, 17, 573 P.2d 1184, 1187 (1978); *DeNoyer v. Cavanaugh,* 221 N.Y. 273, 275, 116 N.E. 992, 992 (1917); *Janikowski v. Yardley's of London, Inc.,* 11 A.D.2d 577, 577, 201 N.Y.S.2d 157, 159 (1960)."

After pointing out that, for the period when the alleged tortious act occurred, Zayre had hired the employee, paid her wages, etc., this Court in *Mackall* concluded that "[t]he evidence was more than sufficient to support an inference that both Alden and Zayre simultaneously were Mackall's employers." 293 Md. at 231, 443 A.2d at 103.

This Court has frequently discussed the various factors or criteria for determining whether an employer-employee relationship existed at a particular time and whether the employee's actions were within the scope of that employment relationship. In *Great Atlantic Tea v. Imbraguglio, supra,* 346 Md. at 590–591, 697 A.2d at 893–894, Judge Karwacki for the Court listed five principal criteria for determining the existence of an employer-employee relationship:

"They include '(1) the power to select and hire the employee, (2) the payment of wages, (3) the power to discharge, (4)

the power to control the employee's conduct, and (5) whether the work is part of the regular business of the employer.' [*Whitehead v. Safway Steel Products, supra,*] 304 Md. at 77–78, 497 A.2d at 808–09 (citing *Mackall v. Zayre Corp.,* 293 Md. 221, 230, 443 A.2d 98, 103 (1982)); *see also Keitz v. National Paving and Contracting Co.,* 214 Md. 479, 491, 134 A.2d 296, 301 (1957)."

As to whether a particular action is within the scope of the employment relationship, we have delineated numerous considerations, including whether the action was in furtherance of the employer's business or was personal to the employee, whether it occurred during the period when the employee was on duty for the employer, whether it related to the employee's duties, whether the action was in a broad sense authorized by the employer, whether the employer had reason to expect that the type of action might occur, whether it occurred in an authorized locality, etc. *See Sawyer v. Humphries,* 322 Md. 247, 255–260, 587 A.2d 467, 470–473 (1991), and cases there cited.

In applying these and other factors, "there are few, if any, absolutes." *Sawyer v. Humphries,* 322 Md. at 255, 587 A.2d at 471. Moreover, in ascertaining whether there is an employer-employee relationship and whether certain action is within the scope of that relationship, "the same basic principles and considerations, applicable to employees generally, are used to determine whether 'police officers, [and] watchmen ...' are acting within the scope of their employment. *See Cox v. Prince George's County, supra,* 296 Md. at 170–171, 460 A.2d at 1042...." *Sawyer v. Humphries,* 322 Md. at 258, 587 A.2d at 472.

Turning to the present case, the evidence that was before the Circuit Court for purposes of the motions for summary judgment was more than sufficient to show an employment relationship between Anderson and the hotel during the attempted robbery, and to show that Anderson was acting within the scope of that employment relationship, even assuming *arguendo* that he was also acting as a Baltimore City

police officer. Anderson was hired as a security guard by the hotel, and he was paid by the hotel for the entire period of time in question. He was on duty as a hotel employee at 8:10 p.m. on the evening of December 2, 1993. The hotel had the authority to discharge him as a hotel security guard.

The evidence also shows that providing security for the hotel and its guests was part of the hotel's business. Anderson himself testified that, when he was hired, he was told that one of his duties for the hotel was to prevent robberies if he could. In addition, under Maryland common law, an innkeeper owes a duty of providing security for the innkeeper's guests and their baggage, and is liable if that duty is breached by the negligence of the innkeeper or the innkeeper's employees. *See, e.g., Roueche v. Hotel Braddock,* 164 Md. 620, 622–628, 165 A. 891, 892–895 (1933); *Treiber v. Burrows,* 27 Md. 130, 143–147 (1867); *Giles v. Fauntleroy,* 13 Md. 126, 137 (1859); *Apper v. Eastgate Associates,* 28 Md.App. 581, 586, 347 A.2d 389, 392–393 (1975), modified on other grounds and affirmed, 276 Md. 698, 350 A.2d 661 (1976). *See also Nalee, Inc. v. Jacobs,* 228 Md. 525, 529, 180 A.2d 677, 679 (1962).[7]

Furthermore, Anderson's testimony concerning the duties for which he was hired by the hotel, the manner of dress, the hotel management's direction that security guards' handguns be concealed, and the assignments given to Anderson and other security guards, showed the type of control which is typical of an employer-employee relationship. Anderson testified that the hotel management person who hired and supervised the security guards

---

7. As pointed out by Chief Judge Orth for the Court of Special Appeals in the *Apper* case, 28 Md.App. at 586 n. 7, 347 A.2d at 392–393 n. 7, and discussed by this Court in the *Hotel Braddock* case, 164 Md. at 622–628, 165 A. at 892–895, and the *Treiber* case, 27 Md. at 143–147, at an early period under the common law, an innkeeper was an insurer of the safety of the innkeeper's guests and their baggage, and was strictly liable for injury to the guests or their baggage. The absolute duty of an innkeeper was later changed to a duty to use reasonable care.

"wanted us to work security. She had special, you know, assignments for us that she wanted and one of them was to prevent robberies, if we could, and police the lot to prevent vehicle thefts, thefts from the vehicles, and wanted us to check on rooms because people would more or less get done with the room and pass the key on to a friend.

"We had to check the rooms and make sure the rooms were empty and supposed to be empty. We also worked as guest service, if people needed towels or soap in their rooms, we did that, too. We had a multitude of assignments there."

The hotel management may not have exercised control over all of the details of how a security guard would attempt to stop a robbery in progress, regardless of whether the security guard was an off-duty police officer or was a trained security guard who was not connected with a police department. Nevertheless, such control is not a prerequisite for an employer-employee relationship. What this Court said in *Greer Lines Co. v. Roberts*, 216 Md. 69, 81, 139 A.2d 235, 240–241 (1958), is fully applicable to the employment of a security guard trained in law enforcement:

"It was suggested by the companies that they could not exercise control over Jarvis because of a lack of knowledge of mechanical work. The right to control may exist, although the ability to control does not. The fact that a particular occupation involves technical skill and training, which put control of the details beyond the capacity of the employer, while a circumstance to be considered, does not require a conclusion of law that no member of a trade or profession involving skill or technical training can be an employee."

The evidence that was before the Circuit Court for purposes of ruling on the motions for summary judgment demonstrated that, during the attempted robbery of the Days Inn, Anderson was employed by the hotel as a security guard and was acting within the scope of that employment. In preventing the completion of an armed robbery, Anderson was performing

one of the specific duties for which he had been hired by the hotel management.

## V.

Neither the Circuit Court's holding nor the Court of Special Appeals' holding in the case at bar can be reconciled with settled principles of Maryland agency law. To reiterate, the same basic principles of Maryland agency law, for determining whether actions of employees generally are within the scope of particular employment relationships, are equally applicable to police officers. *Sawyer v. Humphries, supra,* 322 Md. at 258, 587 A.2d at 472; *Cox v. Prince George's County, supra,* 296 Md. at 170–171, 460 A.2d at 1042–1043. Under those principles of Maryland agency law, the plaintiffs clearly produced sufficient evidence that Anderson was acting within the scope of his employment for the hotel to preclude summary judgment in favor of the hotel.

In other jurisdictions which apply normal principles of agency law under circumstances similar to those in the present case, courts regularly hold that the off-duty police officers and their private employers are liable for injuries resulting from the police officer's tortious conduct in the scope of the officer's secondary private employment. For example, in *Dillard Department Stores v. Stuckey,* 256 Ark. 881, 511 S.W.2d 154 (1974), the plaintiff, while shopping at the defendant's department store, was arrested for alleged shoplifting by an off-duty police officer employed by the store as a security guard. In affirming a judgment in favor of the plaintiff and against the store, the Supreme Court of Arkansas stated (256 Ark. at 883, 511 S.W.2d at 155):

> "In essence the appellant contends that ... an employer, by engaging an off-duty policeman as its agent, can immunize itself from liability for an unlawful arrest whenever the officer acts upon his own initiative. That contention, however, runs counter to the basic rule that a principal is liable for its agent's torts when committed in the course of his employment and for the principal's benefit."

As indicated by the Arkansas Supreme Court, the application of special rules for off-duty police officers, engaged in secondary private employment, grants to the private employers an immunity which cannot be squared with traditional agency principles.

Moreover, there is little rational basis for exempting off-duty police officers employed as security guards and their private employers from liability for the tortious acts of the security guards, but not exempting former police officers, retired police officers, trained security guards, and their employers, from liability. Several cases applying traditional agency principles have made this precise point. Long ago, one federal judge expressed the following view (*Kusnir v. Pressed Steel Car Co.*, 201 F. 146, 150–151 (S.D.N.Y.1912)):

> "Where private parties, even with the consent of the state, employ its police officers to represent them, and do special work for them in protecting and preserving their property and maintaining order on their premises, and such officers are engaged in the performance of their duties to their employers, and are acting within the scope of their powers and duties, they become and are the servants and employes of such private parties and their representatives, and for [tortious] acts, ... unnecessarily committed by them in the line of their duty, and when engaged in the performance of such duties, to the injury of others, the master or employer is liable. Employers cannot escape responsibility for the [tortious] acts of persons employed by them, and representing them, and paid by them, by employing constables, marshals, sheriffs, and peace officers of the state, provided such ... acts are done by such representatives where and while acting within the general scope of the authority conferred on them. To establish a rule to the contrary would lead to the grossest acts of infamy and outrage, and destroy, as it ought, respect for government and courts.

> "The state would not be liable for such acts, and if the employer—that is, the master, who makes the officer his representative for his private purposes—is not, because the

wrongdoer is a police officer, such officer may perform the work he is employed to do in the most grossly careless, wanton, and willful manner, fraught with great peril to others, and the injured party must look to the wrongdoer, usually of no pecuniary responsibility, and not the employer, who employed the wrongdoer to do the very acts complained of. . . ."

The Supreme Court of Tennessee in *White v. Revco Discount Drug Centers,* 33 S.W.3d 713, 721 (Tenn.2000), pointed out that cases applying special rules, and refusing to apply traditional agency principles, to the private secondary employment of off-duty police officers, have "resulted in over-insulating private employers who would otherwise be subject to liability if the security guard were not also employed by a municipal police department." The court continued (33 S.W.3d at 722): "Moreover, eliminating vicarious liability for private employers who hire off-duty police officers encourages such employers to shift their risk of liability to the municipality solely because their employees are also employees of the local police department." The Supreme Court of Tennessee concluded (*id.* at 722):

"Under the . . . rule [applied in some states], the private employer may take advantage of the benefits of hiring an off-duty officer without assuming any of the normal risks of liability associated with hiring non-officer employees. We simply do not believe that in many cases, the risk of loss is properly shifted from the private employer to the municipality or to an innocent plaintiff, and we therefore disagree with the public policy rationales advanced by many of our sister jurisdictions . . . on this issue.

\* \* \*

"After due consideration, we conclude that issues of employer liability for the acts of off-duty police officers are best resolved under traditional principles of Tennessee agency law. Use of agency principles in Tennessee to resolve this complex issue has several advantages. First, because traditional agency principles have been used in this state for two centuries, they possess the advantages of

experience and straightforward application. In addition, these principles do not depend upon the splitting of legal hairs into meaningless distinctions, which is a hallmark of many of the other approaches."

See also, e.g., J.J. Newberry Co. v. Smith, 227 Ala. 234, 236–237, 149 So. 669, 671–672 (1933) (in reversing a judgment for the store, where an off-duty police officer was working as a security guard, and where the officer falsely imprisoned the plaintiff who was a shopper in the store, the Alabama Supreme Court appeared to apply normal agency principles); Cervantez v. J.C. Penney Company, 24 Cal.3d 579, 595 P.2d 975, 156 Cal.Rptr. 198 (1979) (an off-duty police officer, acting as a private security guard in a store, falsely arrested a customer for shoplifting, and the Supreme Court of California reversed a judgment in favor of the store and ordered a new trial); Blair v. Tynes, 621 So.2d 591, 598–599 (La.1993) (the private secondary employer was liable, under the doctrine of respondeat superior, for the tortious conduct of off-duty deputy sheriffs hired to provide security); Duryea v. Handy, 700 So.2d 1123 (La.App.1997) (applies traditional agency principles to hold that the private employer was liable for the tortious conduct of an off-duty deputy sheriff); Rand v. Butte Electric Railway Co., 40 Mont. 398, 408–410, 107 P. 87, 91–92 (1910) (private railroad was liable for injuries caused by the tortious conduct of deputy sheriffs while employed as railroad trainmen); Domanoski v. Borough of Fanwood v. Great Atlantic & Pacific Tea Company, 237 N.J.Super. 452, 456–457, 568 A.2d 123, 125–126 (1989) (an off-duty police officer, employed by a grocery store as a security guard, arrested a suspected shoplifter, and the court held that the officer was simultaneously the employee of the police department and the employee of the store at the time of the arrest); Tillman v. Johnson, 1998 U.S. Dist. LEXIS 17803 (E.D.La.1998) (recognizes that the "dual employment doctrine" may be applicable where a police officer is working for a private employer).[8]

---

**8.** With regard to the employment of off-duty police officers by private businesses as security guards, very few cases in other states take the

In light of settled principles of Maryland agency law, the motions for summary judgment by Anderson, Sage, and Sterling should have been denied.

*WITH REGARD TO THE ACTIONS AGAINST THE STATE OF MARYLAND, THE MAYOR AND CITY COUNCIL OF BALTIMORE, THE BALTIMORE CITY POLICE DEPARTMENT AND THE POLICE COMMISSIONER OF BALTIMORE CITY, THE JUDGMENT OF THE COURT*

---

same position that the Court of Special Appeals adopted in the case at bar, namely that when an incident involving unlawful conduct occurs, the security guard always reverts to his status as a police officer and is no longer an employee of the private business. One case taking this position, and the only case on point relied upon by the Court of Special Appeals, is *Bauldock v. Davco Food, Inc.*, 622 A.2d 28 (D.C.App.1993). *See also Whitely v. Food Giant, Inc.*, 721 So.2d 207 (1998); *Darden v. Louisville & Nashville R. Co.*, 171 Ohio St. 63, 167 N.E.2d 765 (1960).

As discussed in the text above, numerous cases apply ordinary agency law principles to the employment of off-duty police officers by private businesses. This position, we believe, is most consistent with the prior holdings of this Court. *See, e.g., Sawyer v. Humphries*, 322 Md. 247, 258, 587 A.2d 467, 472 (1991); *Cox v. Prince George's County*, 296 Md. 162, 170–171, 460 A.2d 1038, 1042 (1983).

Many cases apply various "middle grounds" between the position of the Court of Special Appeals and the cases applying normal agency law principles. The most frequent "middle ground" is to examine the nature or the character of the off-duty officer's conduct and to determine whether it is the type of act for which the private employer hired the officer or is the type of act which police officers perform. *See McWain v. Greyhound Lines*, 357 So.2d 780 (Fla.App.1978); *Gentry v. Auto Dealers Exchange*, 498 N.E.2d 405 (Ind.App.1986); *Neallus v. Hutchinson Amusement Co.*, 126 Me. 469, 470–471, 139 A. 671, 672 (1927); *Graalum v. Radisson Ramp, Inc.*, 245 Minn. 54, 57–59, 71 N.W.2d 904, 907–908 (1955); *Burnett v. Griffith*, 769 S.W.2d 780 (Mo.1989); *Rice v. Harrington*, 38 R.I. 47, 50–51, 94 A. 736, 737–738 (1915); *Duran v. Furr's Supermarkets*, 921 S.W.2d 778 (Tex.App.1996); *Wheatley v. Washington Jockey Club*, 39 Wash.2d 163, 165–166, 234 P.2d 878, 879–880 (1951). As several of these cases recognize, however, the difficulty with this test is that the nature of the activity for which the private employer hired the off-duty policeman is often the same as the nature of the activity which the policeman performs when on duty for the police department. *See also* the discussion by the Supreme Court of Tennessee in *White v. Revco Discount Drug Centers*, 33 S.W.3d 713, 719–722 (Tenn.2000). Consequently, most of the cases in this middle category take the position that it is for the jury to determine whether the private business or the police department is the employer. The typical result is an affirmance of the jury's decision that the off-duty officer and the private employer are liable.

*OF SPECIAL OF APPEALS IS AFFIRMED, AND THE COSTS SHALL BE PAID BY THE PETITIONER.*

*WITH REGARD TO THE ACTIONS AGAINST KENNETH ANDERSON, SAGE HOSPITALITY RESOURCES, INC., AND STERLING HOTEL, INC., THE JUDGMENT OF THE COURT OF SPECIAL APPEALS IS REVERSED, AND THE CASE IS REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AND REMAND THE CASE TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. THE COSTS IN THIS COURT AND IN THE COURT SPECIAL APPEALS SHALL BE PAID BY THE RESPONDENTS.*